IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IMI NORGREN, INC., a Delaware corporation,<br>    Plaintiff,<br>v.<br><br>D & D TOOLING & MANUFACTURING, INC., an Illinois corporation d/b/a ELECTRO METAL PRODUCTS,<br>    Defendant.<br>v.<br><br>METALS TECHNOLOGY CORPORATION, an Illinois corporation | Case No. 00C 5789<br>Judge St. Eve |

To: Sonia Dhaliwal
Clausen Miller, PC.
10 S. LaSalle Street
Chicago, Illinois 60603

**FILED**
DEC 19 2003
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

### NOTICE OF FILING

PLEASE TAKE NOTICE that on December 16, 2003, I caused to be dispatched for filing with the Clerk of the United States District Court for the Northern District of Illinois, Defendant D & D's Response to Plaintiff's Motion to Enforce Settlement, a copy of which is enclosed herewith and served upon you.

Arthur G. Jaros, Jr.

Arthur G. Jaros, Jr.
Richter & Jaros
1200 Harger Road, Suite #830
Oak Brook, Illinois 60523
(630) 574-0525

### CERTIFICATE OF SERVICE

Under penalties of perjury as provided in 28 U.S.C. §1746, the undersigned certifies that a copy of the foregoing Notice of Filing with attached document was caused to be served by placing copies in the U.S. mail with proper postage prepaid to Sonia Dhaliwal of the law firm of Clausen Miller, PC, to the address noted above this 16th day of December, 2003.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IMI NORGREN, INC., a Delaware corporation, | ) ) ) |
| Plaintiff, | ) |
| v. | ) Case No. 00C 5789 |
| | ) |
| D & D TOOLING & MANUFACTURING, INC., an Illinois corporation d/b/a ELECTRO METAL PRODUCTS, | ) Judge St. Eve ) Magistrate Denlow ) |
| Defendant. | ) |

FILED
DEC 19 2003
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT

Now comes the Defendant D&D Tooling & Manufacturing, Inc. by its attorney Arthur G. Jaros, Jr. and responds to Plaintiff IMI Norgren's Motion to Enforce Settlement as follows:

### SUMMARY

1) As paragraph 2 of Plaintiff's motion concedes, the agreement to resolve the case was expressly subject to the drafting and execution of mutually agreeable settlement documents. As explained below, mutually agreeable settlement documents have, to date, been unable to be developed due to an unforseen problem posed by specific provisions of D&D's bank loan documents, unknown at the time the tentative settlement framework was developed.

2) It was expressly agreed and understood that portions of the settlement framework agreed upon under the mediation conducted by Magistrate Judge Denlow were subject to D&D's subsequent review of its bank loan documents to assure that the provisions of the settlement framework would not risk jeopardizing D&D's critical and sensitive banking relationship. As a result of that subsequent review, it was discovered that parts of the framework, as explained below, would require D&D taking a risk, unacceptable to it, of jeopardizing that vital banking relationship.

3) The transcript (attached to Plaintiff's motion) of proceedings before this Honorable Court

191

on August 13, 2003, plainly demonstrates that the parties had not reached agreement on various aspects of the overall framework.

4) Communications between counsel for the parties confirms that the settlement framework was tentative, subject to future agreement, and conditioned upon satisfactory review of D&D bank documents, and, in no event enforceable until written settlement documents were executed.

5) Plaintiff's motion provides no legal authority in support of the relief it seeks. Given that the settlement framework was not by itself enforceable, the instant motion ought be denied.

## DETAILS

A) On August 12, 2003, the parties appeared before Judge Morton Denlow and worked out a conditional settlement framework consisting of the following elements:

1) A limited assignment of D&D's insurance coverage to IMI Norgren;

2) A consent judgment without recourse against D&D except to the extent of 3) and 4).

3) A payment of $30,000 at the time the settlement agreement was executed.

4) Deferred payments of $270,000 at a rate of $30,000 per year for nine years with no interest to be secured by unascertained assets of D&D.

5) A verified statement pertaining to D&D's financial condition.

The framework was expressly subject to Norgren's review of D&D's insurance policies and satisfaction with the terms thereof and was expressly subject to D&D's counsel's review of D&D's bank documents (not available during the mediation session before Magistrate Denlow) to assure that nothing in the settlement framework would risk D&D's vital banking relationship with its lender bank.

B) Immediately following the afternoon mediation session and extending into that evening,

Norgren's trial counsel had other members of the Clausen Miller firm concentrating in insurance law review D&D's insurance policies. Norgren's trial counsel on the evening of August 12 informed D&D's counsel by e-mail (Exhibit 1) and telephone that the insurance policies were satisfactory to Norgren and attempted to cast the settlement framework as one of "offer" and "acceptance." However, even Exhibit 1 itself noted that there was to be "some security from D&D which had yet to be identified.

C) Counsel for D&D, upon receipt of the e-mail and the telephone call, issued an e-mail (Exhibit 2) later that same evening back to Norgren's counsel advising him that there was no truly binding settlement "until all of the specific settlement terms are worked out and agreed to in a settlement agreement signed by the parties."

D) The transcript (attached to Norgren's motion) of proceedings for the next day August 13 confirmed that the security for the $270,000 in deferred payments had not been worked out. The Court noted that "it sounds like you still have several nuances to resolve."

E) It had been agreed that the principal settlement agreement would be initially drafted by Norgren's counsel. The first draft did not become available to D&D's counsel until September 8, 2003.

F) In the meantime, D&D's counsel had obtained D&D's bank loan documents and reviewed them as expressly contemplated and provided during the August 12 mediation session. D&D's counsel had expected to see provisions that permitted, without bank involvement, creation by D&D of security interests in favor of other creditors, like Norgren, so long as such obligations were kept current and the secured position kept junior to that of the bank. In addition, D&D's counsel felt that such bank documents might also contain a common provision restricting officer compensation and dividend payments for so long as indebtedness exceeded certain specified parameters. Instead, upon

receipt and review of the bank documents, D&D's counsel discovered that those documents (see relevant excerpts attached as Exhibit 3) forbade even junior encumbrancing of D&D's assets without prior express written consent of its bank. The bank documents also forbade incursion of unsecured indebtedness to another creditor without the bank's prior express written approval of a subordination agreement containing a provision precluding payments to such other creditor until D&D's multi-million bank loans were paid off. D&D's counsel discussed these obstacles to the granting of any collateral and to the settlement framework's element pertaining to $270,000 in deferred payments with Norgren's counsel on September 3, 2003, and faxed the relevant provisions to Norgren's counsel at that time.

G) D&D's counsel made a cursory review of the first draft of the settlement agreement the same day it arrived (September 8) and observed that it was drafted in a manner to cause D&D's shareholders to have personal liability for the $270,000 in deferred payments. D&D's counsel immediately called this unagreed and unacceptable provision to the attention of Norgren's counsel (Exhibits 4 and 5).

H) Norgren, by letter dated September 12, 2003, received by D&D in draft form on September 15, confirmed that personal liability of D&D's shareholders was not to be part of the settlement agreement (Exhibit 6).

I) D&D by e-mail (Exhibit 7) also dated September 15 acknowledged receipt of the letter in draft form and reminded Norgren of the problem with D&D's bank document in terms of providing collateral and agreeing to indebt itself for $270,000 in deferred payments. D&D's counsel suggested, as a possible solution, that D&D provide the note for the $270,000 in deferred payments and collateral therefor if Norgren would agree to indemnify D&D if D&D's banking relationship

were impaired on account of D&D providing those elements of the settlement framework.

J) The next day, September 16, D&D furnished a comprehensive redraft of the settlement agreement (Exhibit 8) along with a cover letter (Exhibit 9) setting forth the major changes made to Norgren's initial draft.

K) By e-mail dated October 2, 2003, D&D's counsel responded to Norgren's counsel's status inquiry (Exhibit 10).

L) By e-mail (Exhibit 11) dated October 13, 2003, Norgren's counsel confirmed that D&D would be in technical default of its bank loan by entering into the settlement framework without obtaining its bank's consent.

M) Thereafter, on October 27, D&D's counsel informed Norgren by e-mail (Exhibit 12) that D&D was not willing to risk upsetting its crucial and sensitive banking relationship by seeking the bank's consent or agreement to approve a subordination agreement with Norgren. D&D's counsel again mentioned the possibility, as a palatable solution to both sides, of inquiring into Norgren's willingness to indemnify D&D against loss from disruption of its banking relationship caused by the technical default.

N) On November 3, 2003, Norgren's counsel Sonia Dhaliwal advised the undersigned that Norgren's provision of an indemnity was from her perspective a possible solution that she would explore, but on November 6, 2003, Norgren's counsel advised D&D's counsel by telephone that Norgren's law firm was unwilling to broach the idea of an indemnification agreement with its own client in order to induce D&D (a) to execute a promissory note indebting itself for $270,000 in future payments and (b) to enter into a security agreement collateralizing that note.

O) The parties have been unable to formulate a mutually acceptable "work-around" of the substantial

restrictions contained in D&D's bank documents.

## D&D's POSITION

D&D remains willing to proceed with the limited insurance assignment, consent judgment and immediate payment of $30,000 upon execution of the settlement agreement. Given the restrictive terms of its own bank's loan documents, D&D is unwilling to commit a default thereunder by granting security or by incurring unsecured debt. D&D is unwilling to risk jeopardizing its crucial and sensitive banking relationship (and to risk activating liability of its shareholders on their guarantees) by contacting its bank to seek consent. D&D's bank loan documents specifically permit its bank to deem itself insecure, possibly leading to a declaration of a default. A disruption of D&D's bank relationship on which its financing depends would be catastrophic to D&D and its shareholders who have personally guaranteed multiple millions of dollars of bank indebtedness.

Norgren acknowledges that D&D would, in fact, be committing a default by entering into a settlement framework that contains all of the elements contemplated during the August mediation session before Magistrate Denlow. Norgren believes such default would be merely "technical" in nature. However, Norgren is unwilling to indemnify D&D from injury caused by such technical default.

Norgren has furnished no legal basis by which the relief it seeks can or should be granted. D&D is willing to perform all parts of the settlement framework which do not involve a risk to its critical and sensitive banking relationship. D&D had no duty at any time under the reservation made in developing the settlement framework to risk jeopardizing its multi-million dollar bank loan and banking relationship and ergo the very existence of the company itself as an employer of

considerable numbers of people. D&D recognized and pointed out at all times from and after the August mediation session that the failure to reach a mutually acceptable written settlement agreement could ultimately cause the case to be placed back on the trial call. D&D throughout the process has acted expeditiously, in good faith, and in a manner consistent with the undertakings set forth at the mediation session and with the protection of its critical banking relationship.

## PRAYER

WHEREFORE, D&D prays that the Motion to Enforce Settlement be denied and that the Court order one of the following:

1) Permit Norgren to decide to proceed with the settlement framework *sans* the $270,000 in deferred payments, with or without some mutually agreeable substitute for the $270,000; or

2) Place the case back on the trial call and proceed to issue rulings on the previously submitted motions in *limine*.

D & D TOOLING & MANUFACTURING, INC.,

BY: _____
Arthur G. Jaros, Jr.

Dated: December 16, 2003

Richter & Jaros
1200 Harger Road, Suite #830
Oak Brook, Illinois 60523
(630) 574-0525
Atty. Reg. #01327097

# See Case File For Exhibits